IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge S. Kato Crews

Civil Action No. 1:24-cv-00710-SKC-KAS

MIKE BOULTER, and
BOULTER, LLC,

    Plaintiffs,

V.

NOBLE ENERGY INC.,

    Defendant.

---

**ORDER RE: MOTIONS FOR SUMMARY JUDGMENT (DKTS. 72 & 73)**

---

    This case arises from Defendant Noble Energy, Inc.'s purported breach of three separate oil and gas leases between it and Plaintiffs Mike Boulter and Boulter, LLC (collectively "Boulters"). Dkt. 39, ¶¶15-17. According to Plaintiffs, Noble has improperly deducted post-production costs from the royalties owed to them and other landowners pursuant to the leases. *Id*. Plaintiffs filed this case as a supposed class action, on behalf of themselves and the Class, and they assert a claim for breach of contract for alleged underpayment of those royalties.[1] *Id*. at ¶¶30-33. They seek a

---

[1] This case was bifurcated, with class certification issues pursuant to Fed. R. Civ. P. 23(c) to be determined following a determination on the merits.

1

declaratory judgment as well as monetary damages for themselves and the Class. *Id.* at ¶¶34-36.

This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because: (a) Plaintiffs have brought this case as a class action; (b) the Class contains at least one Class member who is a citizen of a state different from the states where Noble is deemed to be a citizen; and (c) the amount in controversy for the claims of the proposed Class members against Noble exceeds the sum of $5,000,000, exclusive of interest and costs. And Plaintiffs have exhausted their administrative remedies pursuant to the Oil and Gas Conservation Act, Colo. Rev. Stat. §§ 34-60-101, *et seq*.

Before the Court are the parties' respective motions seeking either full or partial summary judgment. Noble has filed a Motion for Summary Judgment seeking judgment in its favor on all claims for relief asserted by Plaintiffs. Dkt. 73. Plaintiffs have filed a Motion for Partial Summary Judgment seeking a finding that Noble is liable for breaching its royalty payment obligations. Dkt. 72. Both motions are fully briefed. *See* Dkts. 86 (Noble's Response), 88 (Plaintiffs' Response), 91 (Noble's Reply), 94 (Plaintiffs' Reply).

The Court has carefully considered the parties' motions and respective briefing, their exhibit attachments, pertinent matters from the Court's own docket, and applicable law and legal authorities. Although the parties requested oral argument (Dkt. 99), the Court concludes no hearing is necessary. Because, when

considering the undisputed material facts, no reasonable jury could conclude Defendants breached the insurance contract, Defendants' motion is GRANTED and Plaintiffs' motion is DENIED.

## STANDARD OF REVIEW

The purpose of summary judgment is to assess whether a trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary judgment is appropriate "when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the "responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, then the nonmoving party must identify material facts showing there is a genuine dispute for trial. *Id.* at 324. A fact is "material" if it has the potential to affect the outcome of a dispute under applicable law. *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995). An issue is "genuine" if a rational trier of fact could find for the nonmoving party on the evidence presented. *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000). In performing this analysis, the factual record and any reasonable inferences from it are construed in the light most favorable to the nonmoving party. *Id.*

When, as here, the Court is faced with cross-motions for summary judgment, the "filing of cross motions does not mean that the material facts are undisputed even

3

if the parties focus on the same claim or defense." *In re Ribozyme Pharm., Inc. Secs. Litig.*, 209 F. Supp. 2d 1106, 1112 (D. Colo. 2002). And denying one does not automatically require granting the other. *See Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1147 (10th Cir. 2002) (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)). While the Court has individually reviewed the motions, because the parties' arguments are consistent across the various papers—either in their own favor, or against the opposing party—the Court addresses them in the same order.

## UNDISPUTED MATERIAL FACTS

Under Fed. R. Civ. P. 56(c), when parties assert that a fact is genuinely disputed, they must support the assertion with citations to specific parts of the record. When they fail to, the Court may consider the fact undisputed for purposes of deciding the motion. Fed. R. Civ. P. 56(e)(2). Based on the Court's review of the parties' respective submissions, the Court accepts the following facts, which are appropriately supported with competent evidence and record citations, as undisputed:

In 1980 and 1981, Boulters' predecessor-in-interest, Frank Boulter, entered three oil and gas leases with Energy Oil, Inc., Noble's predecessor-in-interest. *See* Noble's Statement of Undisputed Material Fact ("NSUMF") Dkt. 91-1, ¶¶1-3. Each of the leases has an identical royalty provision which obligates Noble to give Plaintiffs a portion of the oil extracted from Plaintiffs' land. In the alternative, Noble may pay

4

Plaintiffs the value of the oil. *Id*. ¶5. To date, Noble has paid Boulters for the royalty rather than provide them with a share of the oil produced. *Id*. at ¶¶17, 18.

The leases also allow Noble, as the lessee, to access Boulters' land for the purposes of "mining and operating for oil and gas, and laying pipe lines [sic], and building tanks, power stations and structures thereon to produce, save and take care of said products." *Id*. at ¶6. The leases also provide that "[w]hen requested by [Boulters], [Noble] shall bury its pipe lines [sic] below plow depth." *Id*. at ¶7.

When oil is extracted from a wellhead it may be kept in storage or "stock" tanks on leased land. *Id*. at ¶8. But oil can also be "run" into the pipeline. *Id*. at ¶9. "Run" is a term of art defined as "a transfer of crude oil from the stock tanks, where it is stored on the leased premises after production, to a pipe line [sic]." *Id*.[2] The various types of pipelines include "lead lines, from pumping well to a storage tank; flow lines, from flowing well [sic] to a storage tank; lease lines, extending from the wells to lease tanks; gathering lines, extending from lease tanks to a central accumulation point;

---

[2] Plaintiffs dispute that this is the sole interpretation of the term "run." Doc. 91-1, ¶9. They argue that the terms of the royalty provision must be interpreted within the context of the contract as a whole. But that is a basic rule of contract interpretation and does not create a dispute as to Noble's proffered definition of "run," which, is apparently found in a dictionary of terms widely used in the oil and gas industry. *See* Dkt. 73-7, ¶22 (citing Williams & Meyers Manual of Oil and Gas Terms (18th ed. 2021)). Plaintiffs have not offered any alternative interpretation of the term, and therefore, the Court accepts Noble's definition. Furthermore, Noble's definition of "run" fits easily within the common understanding of the word. *See* RUN, "to flow rapidly or under pressure; to cause to produce a flow (as of water)," Merriam-Webster, https://www.merriam-webster.com/dictionary/run (last visited January 23, 2026).

feeder lines, extending from leases to trunk lines; and trunk lines, extending from a producing area to refineries or terminals." *Id*. at ¶10.

Until 2009, most oil produced from the Wattenberg Field[3]—where Plaintiffs' properties are located—was sold to trucks servicing the local market, which was predominantly the refinery in Commerce City, Colorado. *Id*. at ¶11. In 2009, a new interstate pipeline was constructed to transfer oil from the DJ Basin to a refinery in Cushing, Oklahoma. *Id*. at ¶12. The new pipeline allowed oil and gas producers to increase their production. *Id*. at ¶13.

According to an August 2009 Memorandum that Noble sent to all royalty owners, with the opening of the new interstate pipeline Noble would now be selling oil both locally and in Cushing. *Id*. at ¶26; *see also* Dkt. 73-10. It stated it would be paying royalties based on the weighted average sales price ("WASP"), which is calculated by tallying the total amount received from Cushing sales and local sales divided by the total number of barrels sold. NSUMF, ¶38; *see also* Dkt. 73-10. The memo also informed owners that Noble would incur transportation costs associated

---

[3] The Wattenberg Field is a supergiant oil and gas field located in the synclinal part of the Denver-Julesberg Basin (DJ Basin). The DJ Basin is, in turn, a major oil and gas producing area extending from Colorado into Nebraska, Wyoming, and Kansas. *See* Greater Wattenberg Area, Colorado June 2007, https://ecmc.state.co.us/documents/library/AreaReports/DenverBasin/GWA/Greater_ Wattenberg_Baseline_Study_Report_062007.pdf (last visited January 20, 2026) *and* Higley, D.K., Cox, D.O., Oil and gas exploration and development along the front range in the Denver Basin of Colorado, Nebraska, and Wyoming (2007), https://pubs.usgs.gov/dds/dds-069/dds-069-p/REPORTS/69_P_CH_2.pdf (last visited January 20, 2026).

with moving the oil to the interstate pipeline ("post-production costs"), and that it would deduct a proportionate share of those post-production costs from the Wattenberg royalty owners' payments ("netback method"). NSUMF, ¶27; Dkt. 73-10. These deductions are the source of the dispute in this matter.

Plaintiffs filed this case on March 14, 2024.[4] Dkt. 1. After a period of discovery, the parties filed their respective requests for judgment in their favor. Dkts. 72, 73.[5]

## ANALYSIS

According to Boulters, the leases prohibit Noble from deducting any post-production costs from the royalty payments. Alternatively, Boulters contend the leases are silent as to the allocation of post-production costs, and therefore, the Court must apply Colorado's implied covenant to market. The implied covenant would require Noble to absorb the post-production costs. Dkt. 39. Noble contends the leases

---

[4] Plaintiff originally asserted claims against Noble and Kerr-McGee Oil & Gas Onshore LP. Dkt. 1. Because Plaintiffs' claims against Kerr-McGee were wholly separate—albeit similar—from those against Noble, the Court severed the Kerr-McGee claims. Dkt. 33. *See Boulter v. Kerr-McGee Oil & Gas Onshore, LP*, 24-cv-01459-SKC-KAS (2024).

[5] Docket # 73 is the unredacted version of Noble's Motion. The redacted materials are found at Docket # 70. The Court cites to the materials available to the public (Dkt. 73) because no redacted materials were ultimately necessary to the Court's determination of these matters.

7

are not silent as to costs and instead specifically contemplate an allocation of post-production costs between the parties.[6] Dkt. 73.

Under Colorado law, oil and gas leases are contracts that must be analyzed "applying the fundamentals of contract law to the special context of an oil and gas, lessor-lessee agreement." *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Crestone Peak Res. Operating LLC*, 538 P.3d 745, 750 (Colo. 2023) (citing *Davis v. Cramer*, 808 P.2d 358, 359 (Colo. 1991)). The Court's duty when interpreting a contract is to determine and effectuate the parties' intent and reasonable expectations at the time the contract was made. *Id.* (citing *KN Energy, Inc. v. Great W. Sugar Co.*, 698 P.2d 769, 779 (Colo. 1985)). It does so by first looking at the plain language of the contract, and so long as it is unambiguous and would not result in an absurdity, the Court "give[s] effect to the contract as written." *Lake Durango Water Co. v. Pub. Utils. Comm'n*, 67 P.3d 12, 20 (Colo. 2003). "The intention of the parties must appear expressly or by clear implication." *Id.* In this case, the Court finds the plain language of the leases clearly permits Noble to make the post-production deductions.

The royalty provision states in full that as consideration for access to Boulters' land, Noble agrees:

> To deliver to the credit of the lessor, *free of cost, in the pipe line to which the lessee may connect his wells, the equal [a specified percentage] part of all oil produced and saved from the leased premises, as royalty* or, at

---

[6] As an alternative basis for judgment in its favor, Noble contends Plaintiffs' claims are barred by laches. Dkt. 73, pp.15-21. Because the Court makes a ruling on the merits of Plaintiffs' claims, it need to address the applicability of laches.

> lessee's election, to pay the lessor for such royalty the market price prevailing the day the oil is run into the pipe line, or in storage tanks.

NSUMF at ¶5; Dkt. 73-4 (Oil and Gas Lease) (emphasis added). While the parties' arguments primarily focus on the definition of "pipeline" and "free of cost," the Court instead begins with a different related inquiry: what is the royalty? Distilled down to its most basic, the royalty is oil by the plain terms of the leases. Dkt. 73-4.

Naturally, the next question must be: what oil? The answer to this also lies in the plain language of the leases. It is a percentage of "all oil produced and saved from the leased premises." *Id*. More specifically, the provision states that it is the oil "in the pipe line [sic] *to which the lessee may connect his wells.*" *Id*. (emphasis added). This language plainly contemplates a location on Plaintiffs' property. *See Blasi v. Bruin E&P Partners, LLC*, 959 N.W.2d 872, 877 (N.D. 2021) (in a similar royalty provision, the meaning of "pipeline" is based upon the pipeline's proximity to the lessee's wells).

Plaintiffs attempt to distinguish *Blasi* on the grounds that the royalty provision in that case required the lessee to provide a part of the oil "in the pipeline to which Lessee may connect wells *on said land.*" *Blasi*, 959 N.W.2d 876-78. Plaintiffs emphasize that the royalty provisions here do not specifically state "on said land." Dkt. 88, p.8. The Court is not persuaded that this distinction makes a difference because the royalty provisions in this case nevertheless require delivery of oil in the pipeline to which Noble may attach its wells. Dkt. 73-4. Those contemplated wells must necessarily be located on Boulters' property because those are the only wells

9

from which Boulters could reasonably expect royalties of any sort. Indeed, it would be illogical to interpret this clause of the royalty provision to contemplate oil at a location anywhere other than Plaintiffs' property.

With that answer in hand, the Court turns to the next question: how is the oil to be delivered to Boulters? All parties agree that the answer is "free of cost," and it is undisputed that Noble does not charge any costs to Boulters related to the extraction of the oil. NSUMF, ¶40; Dkt. 73-4. Thus, the royalty to which Plaintiffs are entitled under the leases is cost-free oil in the pipelines—on Plaintiffs property—to which Noble may attach its wells.

Having defined the royalty, the Court turns to the dispute in this case. The royalty provision states that where, as here, Noble decides not to provide Boulters with the royalty in-kind, it must then pay Boulters "the market price prevailing the day the oil is run into the pipe line [sic], or in storage tanks" (market price option). Dkt. 73-4. Noble contends that, under the market price option, the valuation point of the oil is on Plaintiffs' property at the point where it connects its flow lines or gathering pipelines to its wells—the same location it would provide in-kind delivery of oil. *See* Dkt. 91, p.6. Boulters argue that the valuation point for the royalty oil is when the oil is run into the interstate pipeline that transports oil from Wattenberg to Cushing, Oklahoma. Dkt. 88, pp.9-10. The Court disagrees with Plaintiffs' interpretation for several reasons.

10

First, Plaintiffs' interpretation is not supported by the language of the leases. Rather, all other references in the leases to "pipe lines" contemplate those pipelines installed on Plaintiffs' property. *See* NSUMF, ¶¶6, 7. There is nothing in the language of the leases to suggest that "the pipe line" is meant to refer to an interstate pipeline. *Ctr. for Wound Healing & Hyperbaric Med., LLC of Burlington Colorado v. Kit Carson Cnty. Health Serv. Dist.*, 549 P.3d 1018, 1026, *reh'g denied* (Mar. 28, 2024) ("When a contract uses the same term multiple times, we ascribe that term the same meaning."); *see, e.g., Freedom Newspapers, Inc. v. Tollefson*, 961 P.2d 1150, 1153 (Colo. App. 1998) (rule of consistent usage requires that, when the same words are used in different parts of a statute, then those words are ascribed the same meaning). Indeed, while the plain language alone supports its conclusion, the Court observes that the interstate pipeline was not in existence at the time the original parties negotiated and entered these leases. Thus, the parties' intent and reasonable expectations at the time the contract was made would not have included a downstream valuation point as Plaintiffs suggest.

Second, Plaintiffs' interpretation would in fact change the terms of the contract and result in two different royalties dependent on how Noble chooses to meet its obligations. If Noble satisfies its royalty obligations in-kind, it provides oil—for which it has borne the costs of extraction—to Plaintiffs on their property. But if, under Plaintiffs' theory, it chose the market price option, Noble would instead be paying for oil that has been enhanced at its own expense by preparing it for and transporting it

11

from Plaintiffs' property to the interstate pipeline. There is nothing in the royalty provision or the lease to suggest the parties contemplated such asymmetry. Rather, as the Court discussed at the outset, there is one royalty—oil extracted and delivered on Plaintiffs' property, and it is *that* oil Noble pays for under the market price option. *See Kretni Dev. Co. v. Consol. Oil Corp.*, 74 F.2d 497, 500 (10th Cir. 1934) (concluding the valuation point—the connection point of the pipeline with lessee's well—to be "the only reasonable construction which the [royalty provision] will bear and renders its two features symmetrical.").

Third, and relatedly, were the Court to accept Plaintiffs' interpretation, it would result in a windfall in their favor. As noted above, if Plaintiffs were to take possession of the oil royalty, Plaintiffs would bear all costs of preparing the oil and transporting it to a downstream market. But under Plaintiffs' interpretation, Noble would pay those costs. While parties are certainly free to contract for whatever terms they see fit, nothing in the plain language of the leases supports such a windfall, and Plaintiffs have not articulated any reason why the parties would have entered such a bargain.

To be sure, the netback method Noble uses to calculate the market price option is a standard practice in the oil and gas industry to avoid such windfalls to landowners. *Henceroth v. Chesapeake Expl., LLC*, 814 F. App'x 67, 70 (6th Cir. 2020). "Properly understood, the netback method is not a means of cost-shifting; it is a means of determining the net profit on the oil and gas by 'netting' the gross profit."

12

*Anderson Living Tr. v. Energen Res. Corp.*, 886 F.3d 826, 832-33 (10th Cir. 2018). Noble deducts post-production costs not "because the royalty owners are responsible for post-production expenses," but instead "as an accounting mechanism to determine the market value at the wellhead." *Id*; *see also Freeland v. Sun Oil Co.*, 277 F.2d 154, 159 (5th Cir. 1960) (The royalty owner "bears his proportionate part of that cost, but not because [of an] obligation . . . [r]ather, it is because that is the way in which [one] arrives at the value of [oil] at the moment it seeks to escape from the wellhead.").

Plaintiffs, citing the Colorado Supreme Court's opinion in *Rogers v. Westerman Farm Co.*, 29 P.3d 887, 895 (Colo. 2001), contend that Colorado—as an "implied duty to market state"—has definitively rejected operators' use of the netback method unless specifically authorized by the lease. Dkt. 88, pp.11-13. Plaintiffs' reliance on *Rogers* is misplaced.

In *Rogers*, the Colorado Supreme Court considered a fundamentally different question than the one presented here.[7] In that case, the parties entered four different types of oil and gas leases which all provided in some variation for royalties to be *paid* based on the gas "at the well" or "at the mouth of the well." 29 P.3d at 891. The *Rogers* court concluded this royalty language was silent as to the proper allocation of costs,

---

[7] The *Rogers* court did not address the propriety of using the netback method, when permitted, to determine market value.

13

and therefore, Colorado's implied covenant to market applied when calculating the royalty payments.[8]

But as discussed at length above, the royalty in this case is not monetary payments, it is oil. And if Noble chooses to exercise the market value option, it must pay the value of that specifically defined royalty: cost-free oil in the pipelines (on Plaintiffs' property) to which Noble attaches its wells. Noble need not bear any transportation costs for Plaintiffs because the oil to which Plaintiffs are entitled, either in-kind or its monetary value, does not leave Plaintiffs' property. Consequently, the Court concludes the analysis in *Rogers* is inapplicable here.

Finally, Plaintiffs only challenge the fact of Noble's use of the netback method; they do not make any arguments in the alternative regarding the accuracy of the netback method, discrete amounts deducted, the propriety of any one deduction over another, or Noble's use of the WASP. Consequently, the question of whether those deduction amounts or calculations were accurate and proper is not before the Court. Because the Court concludes the plain language of the leases permit Noble to use the netback method in determining the payments to Plaintiffs, no reasonable jury could conclude that Noble has breached these leases. Noble is entitled to judgment in its favor.

\* \* \*

---

[8] The implied covenant to market requires—where a lease is silent with respect to allocation of costs—the lessee to incur those costs and expenses necessary to place the oil or gas in a condition acceptable for market. *Rogers*, 29 P.3d at 903.

14

For the reasons shared above, the Court GRANTS Defendant Noble Energy, Inc.'s Motion for Summary Judgment and DENIES Mike Boulter and Boulter, LLC's Partial Motion for Summary Judgment. As the prevailing party, Noble is entitled to an award of its costs.

IT IS ORDERED the Clerk of Court shall enter judgment in Noble's favor and close this case.

DATED: January 30, 2026.

BY THE COURT:

S. Kato Crews
United States District Judge